J-A11021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.L.C., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.L.C., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1725 MDA 2024 |

Appeal from the Decree Entered November 6, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88886

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                **FILED: JUNE 10, 2025**

Appellant, C.L.C., Sr. ("Father"), appeals from the decree entered in the Berks County Orphans' Court, which granted the petition filed by Berks County Children and Youth Services ("BCCYS") for involuntary termination of Father's parental rights to C.L.C., Jr. ("Child").  We affirm and grant counsel's petition to withdraw.

The Orphans' Court set forth the relevant facts and procedural history of this case as follows:

> On April 8, 2024, BCCYS filed a petition for Involuntary Termination of Parental Rights relative to Father and [A.M. ("Mother").[1]]  A hearing on the petition was held September 9, 2024 and November 1, 2024.  Father was present for day one (1) of [the hearing] via Teams video with his [attorney

---

[*] Former Justice specially assigned to the Superior Court.

[1] Mother is not a party to this appeal.

but he was not present the second day of the hearing.[2]] [Mother] was present with her attorney…and she executed a consent to voluntarily terminate her parental rights on November 1, 2024, the second day of [the hearing]. On November 6, 2024, this [c]ourt entered a final Order terminating the parental rights of Father and Mother, finding that BCCYS had established its burden under Section 2511 of the Act by clear and convincing evidence.

* * *

BCCYS has a history with Mother dating back to 2014 due to concerns of mental health, domestic violence and a lack of appropriate parenting skills. … The Agency received a report on February 17, 2023 that videos were posted on social media of Mother physically and verbally abusing Child's sibling. It was reported that the videos showed Mother hitting Child's Sibling in the face/head area with an open hand and the ribs/abdomen area with a closed fist. It was also reported that Mother told Child's Sibling she would "beat the shit out of him" and she would "strangle him." …

BCCYS contacted Father, who expressed his concerns, but was unable to locate Mother and his Child. At that time, Father was receiving medical treatment for liver abscesses. BCCYS … [ultimately learned from] Maternal Cousin [that] she had Child and temporary guardianship papers. …

By Order of Adjudication and Disposition, dated April 5, 2023, [the court] found that the Agency proved by clear and convincing evidence that Child was a Dependent Child due to a lack of proper care or control, subsistence, education as required by law, or other care or control necessary for their physical, mental, or emotional health, or morals. Legal and physical custody were transferred to BCCYS. Father did not attend this adjudicatory hearing due to hospitalization. The [c]ourt found that based upon findings of abuse, neglect or dependency of Child, it was in the best interest of Child to be removed from the home of Mother. Mother's visitation

_____

[2] We note that the court appointed the guardian *ad litem* for Child to also represent Child's legal interests. The court concluded that no conflict prevented counsel from serving in this dual role.

was suspended. Visitation between Father and Child was ordered to be professionally supervised and was to occur once every two (2) weeks for two (2) hours in duration.

… On [April 5, 2023], Father was ordered to participate in parenting education; a mental health evaluation and follow any recommendations; drug and alcohol evaluation and any recommended treatment; random urinalysis; a domestic violence evaluation and any recommended services; casework services through BCCYS and any recommendations; establish and maintain stable and appropriate housing and income; keep BCCYS updated regarding changes in residence or income; sign releases of information when requested; supervised visitation with Child while acting in an appropriate manner; and Non-Offending parent evaluation and follow any recommendations.

Father has a criminal history dating back to 2014. …

Father has a Protection from Abuse ("PFA") history dating back to 2012. …

Father is currently imprisoned…. He was arrested November 19, 2023. Father pled not guilty to eighteen (18) different charges. Father faces … charges for possession of fentanyl, methamphetamines, or other drugs and firearms[.] …

Throughout the two-day [hearings], Father did not testify on his own behalf. Although Father participated in the first day of [the hearing], he chose not to participate in the second day of [the hearing] even though he intended to testify. He informed his counsel that he no longer wanted to testify or participate in proceedings due to his commitment to a prison boot-camp program.

\* \* \*

[Testimony from BCCYS' witnesses at the hearing, whom the court found credible, demonstrated that] Father's conduct throughout the time his Child has been in placement evidenced a disregard for the truth and an unhealthy contempt towards the Agency and their efforts to protect Child. At first, Father was engaged in casework services and

supervised visits with Child. Then, Father's participation in services decreased and eventually ceased. Upon incarceration, Father barely communicated with Child on a regular basis. One video visit was held. Father is incarcerated due to his own actions and did not provide the court with a release date. Father has been largely absent since before incarceration to the point of evidencing abandonment of Child in favor of terminating his parental rights. The fact that he chose not to participate in the [hearings] further shows his lack of interest in reunification with Child.

(Orphans' Court Opinion, filed 12/27/24, at 1-6; 13-14) (internal citations and footnotes omitted).[3] Father timely filed a notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) statement on November 21, 2024.

Preliminarily, appellate counsel seeks to withdraw representation pursuant to **Anders v. California**, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009). **Anders** and **Santiago** require counsel to: (1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; (2) file a brief referring to anything in the record that might arguably support the appeal; and (3) furnish a copy of the brief to the appellant and advise him of his right to obtain new counsel or file a *pro se* brief to raise any additional points the appellant deems worthy of review. **See Santiago, supra** at 173-79, 978 A.2d at 358-61. "Substantial compliance with these requirements is

---

[3] The Orphans' Court further summarizes the testimony from each of BCCYS' witnesses in its opinion. (**See id.** at 7-13).

sufficient." ***Commonwealth v. Reid***, 117 A.3d 777, 781 (Pa.Super. 2015). After establishing that counsel has met the antecedent requirements to withdraw, this Court makes an independent review of the record to confirm that the appeal is wholly frivolous. ***Commonwealth v. Palm***, 903 A.2d 1244, 1246 (Pa.Super. 2006). ***See also Commonwealth v. Dempster***, 187 A.3d 266 (Pa.Super. 2018) (*en banc*).

In ***Santiago, supra*** our Supreme Court addressed the briefing requirements where court-appointed appellate counsel seeks to withdraw representation:

> Neither ***Anders*** nor [***Commonwealth v. McClendon***, 495 Pa. 467, 434 A.2d 1185 (1981)] requires that counsel's brief provide an argument of any sort, let alone the type of argument that counsel develops in a merits brief. To repeat, what the brief must provide under ***Anders*** are references to anything in the record that might arguably support the appeal.
>
> *    *    *
>
> Under ***Anders***, the right to counsel is vindicated by counsel's examination and assessment of the record and counsel's references to anything in the record that arguably supports the appeal.

***Santiago, supra*** at 176, 177, 978 A.2d at 359, 360. Thus, the Court held:

> [I]n the ***Anders*** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that

have led to the conclusion that the appeal is frivolous.

*Id.* at 178-179, 978 A.2d at 361. *See also In re J.D.H.*, 171 A.3d 903, 905-06 (Pa.Super. 2017) and *In re V.E.*, 611 A.2d 1267, 1275 (Pa.Super. 1992) (explaining that *Anders* procedure applies in appeals from termination of parental rights and goal change orders).

Instantly, appellate counsel has filed an application to withdraw. The application states that counsel has reviewed the record and determined that there are no non-frivolous grounds for an appeal. Counsel subsequently sent a copy of the *Anders* brief to Father. Counsel also provided Father with a letter explaining his right to retain new counsel or proceed *pro se* to raise any additional points Father deems worthy of this Court's attention.[4] In the *Anders* brief, counsel summarized the facts and procedural history of Father's case. The argument section of the brief cites to portions of the record that might arguably support Father's issues on appeal. Counsel also provides the reasons for counsel's conclusion that the appeal is wholly frivolous. Therefore, counsel has substantially complied with the technical requirements of *Anders* and *Santiago*. *See Reid, supra*.

Father has not responded to the *Anders* brief *pro se* or with newly retained private counsel. Counsel raises the following issues on Father's

---

[4] By orders filed on May 6, 2025 and May 22, 2025, this Court directed counsel to file with this Court the letter advising Father of his appellate rights, as well proofs of service for counsel's application to withdraw and *Anders* brief confirming service on Father, as those documents were not initially attached to counsel's filings. On May 22, 2025, counsel complied with this Court's directives.

behalf:

> 1. Whether counsel for [Father] met the requirements of **Anders v. California** and **Commonwealth v. Santiago**?
>
> 2. Did the [Orphans'] Court err by terminating [Father's] parental rights based upon the grounds for involuntary termination set forth Pennsylvania Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), because [BCCYS] did not establish by clear and convincing evidence that [Father's] parental rights should be terminated?
>
> 3. Did the [Orphans'] Court err by terminating [Father's] parental rights based on the grounds for involuntary termination set forth in 23 Pa.C.S.A. § 2511(a)(2), because [BCCYS] did not establish by clear and convincing evidence that [Father's] parental rights should be terminated?

(**Anders** Brief at 6).[5]

In his second and third issues combined, Father argues that he was making progress with ongoing services for Child to reside with him upon his release from prison. Father asserts that through the programs offered in prison, Father has prepared for his return to society. Father claims that testimony from the caseworkers confirmed his cooperation with court-ordered services and visits. Father insists that termination of his parental rights is not in Child's best interests. Father suggests the court should give him more time to fulfill his parental duties to show continuing interest in Child and a genuine effort to maintain a place of importance in Child's life. Father avers that his

---

[5] As we have already discussed, counsel has satisfied the technical requirements of **Anders** and **Santiago**. Thus, we need not further address the first issue presented in the **Anders** brief.

individual circumstances demonstrate that he has neither failed nor refused to perform parental duties. Father concludes that BCCYS failed to provide clear and convincing evidence to prove termination was warranted under Section 2511(a)(1) and (2), and this Court must grant relief.[6] We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by

---

[6] We note that aside from generally referencing Child's "best interests," Father makes no specific argument that termination of his parental rights was improper under Section 2511(b). Thus, we limit our review to whether termination of Father's parental rights was proper under Section 2511(a).

clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

The Orphans' Court granted involuntary termination of Father's parental rights to Child on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the

conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117. When conducting a termination analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of…his parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled

intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.  In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties.  Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child **or fails to perform parental duties.**

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted)

(emphasis added).

With respect to incarcerated parents:

> [A] parent's absence or failure to support his or her child due to incarceration is not, in itself, conclusively determinative of the question of parental abandonment. Indeed, incarceration alone is not an explicit basis upon which an involuntary termination may be ordered pursuant to Section 2511 of the … Adoption Code.  Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison to continue to pursue a close relationship with the child[.]  An incarcerated parent desiring to retain parental rights must exert him—or herself to take and maintain a place of importance in the child's life.

> *       *       *

> [T]his Court has never adopted or countenanced a view that incarceration alone ... represents appropriate and sufficient grounds for the involuntary termination of parental rights…. [W]hen a parent uses the opportunities that are available in

- 11 -

> prison to make sincere efforts to maintain a place of importance in the lives of his or her children, incarceration alone will not serve as grounds for the involuntary termination of his or her parental rights under Section 2511(a)(1).

*In re T.L.H.*, ___ A.3d ___, ___, 2025 PA Super 102, 2025 WL 1375945 at *9 (Pa.Super. 2025) (quoting *In re R.I.S.*, 614 Pa. 275, 284-87, 36 A.3d 567, 572-74 (2011)).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re Z.P., supra* at 1117. "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 1117-18. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The

court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental-bond. "In cases where there is no evidence of any bond between the

- 13 -

parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

Instantly, the Orphans' Court determined that termination of Father's parental rights was proper under Section 2511(a)(1) as follows:

> In light of Father's criminal involvement and repeated incarceration, this background suggests Father will have an unpredictable and unsettled future path without any assurances he will be able to provide a consistently safe and nurturing home for Child. Father's past is riddled with various criminal convictions including possession of controlled substances and firearms. While Father did participate in casework services and supervised visitation from the onset of the case, he abruptly ceased attendance with [Signature Family Services ("SFS")] on October 6, 2023. Further, testimony does not show that Father has provided Child with any education, emotional or financial support from prison.
>
> This [c]ourt's decision to terminate Father's parental rights to Child was based on clear and convincing evidence which established that Father's conduct for at least six (6) months prior to the filing of the petition to terminate revealed a settled purpose relinquishing parental claim to Child and revealed a failure to perform parental duties. This [c]ourt found the evidence supported the conclusion that Father lacks the present and future capacity to provide parental care, control or subsistence necessary for Child's physical and mental well-being. Father cannot provide for Child's basic needs nor can he provide a structured environment for Child was he is incarcerated.

(Orphans' Court Opinion at 17). With respect to Section 2511(a)(2), the

Orphans' Court found:[7]

> … Father entered prison when Child was only fourteen (14) months old. Father completed some court-ordered casework services with SFS prior to incarceration but was not successfully discharged due to sporadic attendance. Father claimed he was overwhelmed at one point and simply stopped visiting his son. While in prison in New York, Father participated in group-based counseling programs that focused on financial education, community re-entry and stress and anger management. The Agency never received any additional information about the programs Father participated in. While Father's efforts to participate in these services are commendable, they are not enough to evidence his ability to remain present in Child's life. Father lost contact with all providers in October 2023 and resurfaced a month later incarcerated in New York. Father chooses to disappear when things get tough instead of facing challenges head on.
>
> While incarcerated, Father was ordered to participate in video visits with his son at his request. Between January 10, 2024 and June 14, 2024, Father failed to request these visits. It was not until [BCCYS caseworker] Ms. Kenderdine initiated contact by phone on June 14, 2023, that Father asked and participated in a supervised video visit on August 2, 2024. Ms. Kenderdine made five additional attempts to contact Father at the prison to arrange further video visits but never heard back.
>
> It was Father's choice to engage in activities that led to his incarceration rather than engaging in services that would be beneficial and necessary to return Child to him. Despite numerous attempts by BCCYS to contact and engage Father, despite his acknowledgment of receiving communication, he made minimal efforts to reach back out to engage while incarcerated.

---

[7] Although we need only agree with the Orphans' Court that termination was proper under any one subsection of Section 2511(a), we provide the court's analysis under both subsections in an abundance of caution. *See In re Z.P.,* *supra*.

- 15 -

(Orphans' Court Opinion at 20-21). The record supports the court's analysis that termination of Father's parental rights was proper under Section 2511(a)(1) and (2) for the reasons outlined above.[8] *See In re Z.P., supra*. Although Father's incarceration may have posed a barrier to his relationship with Child, the record demonstrates that Father simply failed to exert himself to maintain a place of importance in Child's life while incarcerated. *See In re T.L.H., supra*. Following an independent review of the record, we agree that the appeal is frivolous. *See Dempster, supra*; *Palm, supra*. Accordingly, we affirm and grant counsel's petition to withdraw.

Decree affirmed. Petition to withdraw is granted.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 6/10/2025

_____

[8] We reiterate that Father does not challenge on appeal the court's termination decision under Section 2511(b). Nevertheless, we note that the Orphans' Court also opined that Child has no bond with Father, is well-bonded to his foster family, and that termination of Father's parental rights would best serve Child's developmental, physical, and emotional needs and welfare. (*See id.* at 21). (*See also* Final Decree, filed 11/6/24, at 2).